859 F.2d 921
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Ronnie Charles FRYE, Plaintiff-Appellant,
v.
GENERAL ELECTRIC CREDIT CORPORATION, Defendant-Appellee.
 No. 87-6146.
 United States Court of Appeals, Sixth Circuit.
 Oct. 7, 1988.
 
 Before BOYCE F. MARTIN Jr. and DAVID A. NELSON, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff Ronnie Charles Frye, a Knoxville real estate investor, borrowed funds from General Electric Credit Corporation (GECC) to finance the purchase of an apartment complex. Frye encountered financial difficulties, and GECC foreclosed the mortgages it had taken on various apartment buildings owned by Frye. Frye sued GECC for breach of contract, fraud, intentional interference with business relations, inducement of breach of contract, and usury. The district court granted GECC's motion for summary judgment on each of these claims, and Frye has appealed. We believe the district court's disposition of each of these claims was proper, and we shall affirm the judgment.
 
 
 2
 * In late 1978 Frye agreed to buy the Crestridge apartment complex contingent on getting the necessary financing. After various meetings and conversations with Ron Windsor, a loan officer at GECC's Atlanta office, GECC issued a commitment letter for a loan of $2,050,000. At the Crestridge closing Frye signed a promissory note for $2,050,000, repayable on March 25, 1982, at an interest rate of 12.5 percent for the first year and 3.5 percentage points above the prime rate for the second and third years. As security, Frye gave GECC deeds of trust on Crestridge and two other Knoxville apartment complexes he owned, Concorde and Grande.
 
 
 3
 Frye was unable to pay interest on the loan after April 1, 1980. The parties orally agreed to a "bow tie" loan modification under which Frye would be required for a time to pay the interest only up to a maximum rate of 15 percent, with any interest accruing above this rate to be payable at the maturity of the loan. This arrangement was later confirmed in writing.
 
 
 4
 In August of 1981 Frye and a business associate, Rex Moon, went to Atlanta to meet with Windsor and Van Caswell, another GECC officer, to discuss Frye's interest in converting Crestridge to condominiums. In his complaint Frye alleges that Windsor and Caswell orally agreed at that meeting to extend the Crestridge loan for 18 months. GECC denies that any such agreement was made, and points out that Frye's allegation is inconsistent with his sworn deposition testimony. Furthermore, GECC points to a letter from Moon to Caswell, written two months after the alleged contract was formed, in which Moon asks GECC to "consider" an extension of the existing loan. A letter sent by Moon several months later "request[s] ... an extension."
 
 
 5
 On March 15, 1982, Caswell called Frye to remind him that the loan was due to be paid in full on March 26. The next day Caswell sent Frye a letter confirming the amount due and giving instructions on how it should be paid. Frye was unable to pay on the appointed date. Various attempts to reach agreement on repayment were unsuccessful.
 
 
 6
 In July of 1982 Frye filed for bankruptcy. The parties subsequently entered into a stipulation in the bankruptcy court, agreeing that the automatic stay with respect to Crestridge would end on February 28, 1983, while the automatic stay with respect to Concorde and Grande would remain in effect until March 31, 1983. After the expiration of each stay GECC would "be free to enforce its personal property security interest and its rights under its deed of trust therein without further delay, restraint or order of Court." Frye was entitled to sell Crestridge "at any time prior to foreclosure sale by [GECC]," provided he could turn over to GECC net cash proceeds of $2 million or more. He was entitled to sell Concorde provided that he could turn over to GECC net cash proceeds of $600,000 or more. GECC agreed "that it and its employees and agents will not interfere with the Debtor's efforts to sell the Crestridge and Concorde Apartments."
 
 
 7
 Frye stipulated that "[t]he allegations contained in the complaint and the amended complaint for relief from the automatic stay filed by [GECC] are true and all of defendant's defenses are withdrawn." Frye also stipulated that he was
 
 
 8
 "truly and legally indebted to [GECC] in the sum of $2,471,474.78 (which sum includes principal of $2,050,000.00), together with costs and attorneys fees through said date in the amount of $49,669.65. Interest continues to accrue thereon at the rate of $1,174.66 per day, together with plaintiff's future costs and attorneys' fees."
 
 The parties further stipulated that
 
 9
 "The covenants of General Electric Credit Corporation are personal to the Debtor, as Debtor-in-Possession and may not be sold or assigned by it and shall apply only so long as the Debtor remains under Chapter 11 of the Bankruptcy Code."
 
 
 10
 As contemplated by the stipulation agreement, Frye attempted to negotiate the sale of his various apartment complex holdings. He orally agreed with Dewey Waddell, another real estate investor, to give Waddell a 50 percent stake in Crestridge if Waddell could come up with the money to pay off the GECC loan. Ernest Norcross, a Waddell attorney who was also financially interested in the project, telephoned James Kelley, GECC's attorney, on March 28, 1983. Norcross asked Kelley whether the scheduled March 31 foreclosure on Crestridge could be delayed for two weeks. Kelley said the foreclosure would take place as scheduled and that Norcross would have to come up with $2.6 million to buy out GECC's position in all three buildings. When Norcross asked Kelley how much it would take to buy out GECC's position in Crestridge alone, Kelley said it would take $2.1 million. Norcross and Kelley did not specifically discuss the price GECC would require to release the Concorde and Grande buildings only. Norcross apparently assumed that GECC would release those buildings for $500,000, a figure he arrived at by subtracting the $2.1 million figure for Crestridge from the $2.6 million figure for all three buildings; however, he and Kelley never explicitly discussed a figure for the release of Concorde or Grande alone.
 
 
 11
 On March 31, 1983, Norcross called Kelley again and asked about the Concorde building specifically. Nothing concrete was agreed upon, apparently, but the "culmination" of the conversation was that GECC would allow its position to be bought out for $500,000. On that date, GECC sold Crestridge at a foreclosure sale for $2.1 million.
 
 
 12
 On April 10, 1983, Norcross called Kelley again to express his interest in buying out GECC's position in Concorde for $500,000. Kelley said the building could no longer be released at that price, since GECC had received a $575,000 offer from Mudball, Inc., another real estate investment firm. Norcross testified that Kelley's attitude was "not uncooperative," just "businesslike."
 
 
 13
 Frye also received an independent offer on the Concorde apartments from United Capital Properties, an Alabama firm. The offer instructed Frye that if he "would like to enter into such an agreement, please sign this letter, and advise us at the earliest possible date." Instead of signing the letter, Frye responded with a counteroffer containing materially different terms.
 
 
 14
 Alleging among other things that GECC violated the stipulation agreement and tortiously induced Norcross, Waddell, and United Capital Properties to break contracts with him, Frye sued GECC in the Circuit Court of Knox County, Tennessee. GECC removed the case to the United States District Court for the Eastern District of Tennessee. After extensive discovery, the district court granted summary judgment to GECC with respect to Frye's fraud and usury claims and that part of Frye's breach of contract claim based on the alleged oral agreement to extend the loan. It declined to grant summary judgment with respect to Frye's intentional interference with business relations claim, inducement of breach of contract claim, and that part of the breach of contract claim based on the stipulation agreement. After additional discovery, GECC renewed its motion for summary judgment on these claims, and the district court granted the motion. This appeal followed.
 
 II
 
 15
 The complaint alleges the breach of two separate agreements. First, Frye alleges that GECC broke an oral contract to extend the Crestridge loan for 18 months. Second, Frye alleges that GECC violated the agreement contained in the bankruptcy court stipulation not to interfere with Frye's attempts to sell the apartment complexes. We shall discuss these two breach of contract claims separately.
 
 
 16
 * The district court concluded that Frye was estopped from contending that there was an oral contract to extend the loan, Frye having stipulated in the bankruptcy proceedings that there was no such oral agreement. More precisely, it was stipulated that all of the "allegations contained in [GECC's] complaint ... are true." One of those allegations was that the "entire unpaid balance together with accrued interest" was due on March 26, 1982. As the district court put it,
 
 
 17
 "Frye was allowed to buy time with promises. One of his promises was to accept GECC's version of the facts up to that date and to withdraw previously asserted defenses.... Now that the time Frye bought has passed and his efforts to pay off the debt has failed, he asks this Court to ignore his original promise and allow him to litigate issues he promised were resolved. It was reasonable for GECC to rely on Frye's statement. GECC did take action based on the statements. Now GECC is subject to loss based on this reliance. Because Frye induced GECC's reliance, he is estopped from disappointing it. Frye is estopped from asserting the breach of contract and fraud claims because they directly contradict the facts Frye accepted in the stipulation agreement."
 
 
 18
 We believe the district court's analysis of this issue is sound. Frye's only argument against it, that GECC is "estopped to claim the benefits of estoppel" because GECC has engaged in fraud or has not "done equity," is unconvincing. GECC has done nothing more than aggressively protect its own legitimate business interests.
 
 
 19
 Even if Frye were not estopped from asserting the existence of an oral contract to extend the loan, summary judgment would be appropriate on this claim for two other reasons. First, since that contract could not have been performed within a year, the statute of frauds required the contract to be in writing. Tenn.Code Sec. 29-2-101(5). The statute of frauds was properly pleaded as an affirmative defense, and there was no part performance taking the alleged agreement out of the statute of frauds. Second, the evidence against the existence of such an oral agreement is overwhelming, and there is no genuine issue of material fact as to the formation of the supposed agreement. Frye's business partner, Rex Moon, wrote letters to GECC requesting an extension two months and six months after the alleged agreement to an extension. Frye himself gave sworn testimony at his deposition that there was no oral extension agreement. In the face of this, a conclusory allegation that such an agreement existed is not enough to survive a motion for summary judgment.
 
 B
 
 20
 The district court concluded that GECC was entitled to summary judgment on Frye's claim that GECC had broken the agreement because that stipulation agreement was personal to Frye as "debtor-in-possession." Since Frye is no longer a debtor-in-possession, his bankruptcy petition having been dismissed, the district court held that Frye could not pursue this claim against GECC.
 
 
 21
 Normally, the provisions of such a stipulation agreement are enforceable just as any other contract would be. Tennessee's statute of limitations for breach of contract actions is six years, Tenn.Code Sec. 28-3-109(3), and the provision relied upon by the district court does not prevent the application of that statute of limitations. The provision in question merely defined the time period during which any interference by GECC with Frye's attempts to sell the buildings would be wrongful as the period during which Frye is a "debtor-in-possession;" it did not extinguish Frye's right to recover damages for a wrong unquestionably committed, if at all, during that time period.
 
 
 22
 But summary judgment was appropriate for another reason. The stipulation agreement required GECC to forbear enforcing its rights under the deeds of trust only until certain specified dates; after those dates, the automatic stay expired and GECC was entitled to enforce its rights "without further delay, restraint or order of Court." Thus, under the terms of the stipulation agreement, GECC was legally entitled to enforce its deed of trust with respect to Crestridge as of February 28, 1983, and with respect to Concorde and Grande as of March 31, 1983. In fact, GECC did not foreclose on Crestridge until March 31, 1983, a full month after it was legally entitled to do so. Similarly, GECC's insistence on $575,000, rather than $500,000, to buy out its position in Concorde did not come until April 11, 1983, after the March 31 deadline provided for in the stipulation agreement.
 
 III
 
 23
 Frye's fraud claim contains two principal elements. First, Frye claims that GECC fraudulently represented that the due date on the promissory note would be extended. This is essentially a variation of the allegation that GECC violated an oral agreement to extend the loan agreement. Frye further alleges that GECC solicited a prearranged bid on Crestridge from one of its clients.
 
 
 24
 In addressing the first of these allegations, the district court correctly concluded that Frye was estopped by his prior stipulation in bankruptcy proceedings from claiming that any representation about extending the loan agreement had ever been made. Summary judgment is appropriate with respect to the second aspect Frye's claim as well. Frye points to nothing in the record that supports his conclusory allegation that a "fraudulent" foreclosure sale was conducted.
 
 IV
 
 25
 Tennessee recognizes a cause of action for tortious interference with business relations:
 
 
 26
 "[O]ne's business is entitled to protection 'from tortious interference by a third person who, in interfering therewith, is not acting in the exercise of some right, such as the right to compete for business.' "
 
 
 27
 Lann v. Third National Bank, 198 Tenn. 70, 72, 277 S.W.2d 439, 440 (1955). To prevail on such a claim, the plaintiff must show malice, ill will, or wrongful motive. Id. The district court concluded that GECC did nothing malicious.
 
 
 28
 "Rather ... GECC's principal motive was governed by its own economic interest and the actions taken by its representatives were in furtherance of that interest. Quite simply, someone made GECC a better offer while Frye was negotiating, and GECC accepted. The Court finds that GECC was under no legal duty to wait indefinitely for Frye to refinance these apartment complexes."
 
 
 29
 The district court correctly applied the Tennessee law. The record contains no support for Frye's contention that GECC acted with the "objective of destroying Frye and depriving him of his property or any chance of retaining his property." GECC renegotiated the terms of Frye's loan and granted him numerous extensions to try to permit him to refinance the apartment complexes and resolve his economic difficulties. Frye was simply unable to do so, and eventually GECC did what it had a legal right to do under the terms of both the loan agreement and the stipulation agreement.
 
 V
 
 30
 Frye alleges that he had contracts with Norcross, Waddell, Valley Fidelity Bank, and John Wellons, another investor, with respect to the condominium conversion and refinancing of the various apartment complexes Frye owned. Frye alleges that GECC induced some of these parties to break their contracts with Frye in various ways in late March and early April 1983.
 
 
 31
 The district court found that Frye had no enforceable contract with and any of these parties. The statute of frauds requires all agreements concerning the conveyance or transfer of any interest in land to be in writing. Tenn.Code Sec. 29-2-101(3). This requirement clearly applies to loans to be secured by interests in real property, the type of contract involved here. Lambert v. Home Federal Savings & Loan Association, 481 S.W.2d 770, 772-773 (Tenn.1972). The existence of a "legal contract" is an essential part of a cause of action for inducement of breach of contract. Dynamic Motel Management v. Erwin, 528 S.W.2d 819, 822 (Tenn.App.1975). Since Frye had no enforceable contract with anyone, GECC cannot be said to have induced anyone to breach a contract with Frye.
 
 
 32
 Frye makes numerous unpersuasive attempts to avoid the force of the district court's opinion. First, he cites cases in which noncompliance with the statute of frauds in the formation of the contract was held not to preclude an action for inducement of breach of contract. In those cases, however, the defendant did not properly plead the statute of frauds defense, as required by Tennessee law. GECC did so. Frye further claims that he had an "implied contract," or, in the alternative, that he had contracts that were partially performed so as to take them out of the statute of frauds. These arguments have no merit.
 
 
 33
 We note also that there is no genuine issue of material fact with respect to at least two other elements of the cause of action for inducement of breach of contract. Frye could not show malice on the part of GECC, nor could he show that GECC acted with the intent of inducing the breach of those contracts. See Dynamic Motel Management, 528 S.W.2d at 822.
 
 VI
 
 34
 The district court correctly held that the stipulation agreement barred Frye from asserting his usury claim. Frye had asserted usury as a defense to GECC's complaint in the bankruptcy proceeding. In the stipulation agreement, Frye agreed to withdraw all of his previously asserted defenses and accepted as true all of the allegations in GECC's complaint.
 
 
 35
 The judgment of the district court is AFFIRMED.